1

2

3

4

5                        UNITED STATES DISTRICT COURT

6                       NORTHERN DISTRICT OF CALIFORNIA

7

8    CHRISTOPHER BOATMAN,                      No. C 06-5234 SI (pr)

9             Petitioner,                      **ORDER DENYING HABEAS
                                               PETITION**
10       v.

11   Governor SCHWARZENEGGER,

12            Respondent.
                                          /
13   _____

14                            **INTRODUCTION**

15       Christopher Boatman, an inmate at San Quentin State Prison, filed this pro se action

16   seeking a writ of habeas corpus under 28 U.S.C. § 2254.  This matter is now before the court for

17   consideration of the merits of the pro se habeas petition.  For the reasons discussed below, the

18   petition will be denied.

19

20                            **BACKGROUND**

21       Christopher Boatman was convicted of second degree murder pursuant to a guilty plea

22   in Fresno County Superior Court.  In 1986, he was sentenced to 15 years to life in prison plus

23   a one-year enhancement for possession of a firearm during the commission of the crime.  In this

24   habeas action, he challenges the execution of his sentence rather than the conviction.

25   Specifically, Boatman asserts that his right to due process was violated by California Governor

26   Schwarzenegger's August 24, 2005 decision to reverse the finding of parole suitability by the

27   Board of Prison Terms, now known as the Board of Parole Hearings ("BPH").

28

**United States District Court**
For the Northern District of California

A.      The Murder

The reports considered at the parole suitability hearing described the crime leading to the murder conviction as follows:

On May 29, 1986, Boatman was free-basing cocaine with his friends, Harold Jones and Roland Montgomery.  After the cocaine ran out, they decided they needed money to buy more cocaine and decided to rob a store to obtain that money.  Boatman took his stepmother's gun from her dresser and drove himself, Jones and Montgomery around town looking for a store to rob.  Boatman obtained his stepmother's handgun because it could be concealed more easily than Jones' sawed-off shotgun.  Boatman gave the gun to Jones for use in the robbery.  While they were together planning the robbery, Jones used Boatman's gun to fire a shot at an empty can.  Jones said that they were not going to worry about getting caught although they did not intend to wear masks in the robbery.  The threesome drove by at least three stores before selecting the 41 Market as the robbery target.  The other stores were rejected because there were too many people around those stores.

At the 41 Market, the store clerk (John Sousa) handed over the money without resisting.  Sousa turned away and Jones shot him in the back of the neck while Boatman stood by the entrance to the store acting as a look-out and Montgomery sat in the get-away car.  A customer discovered Sousa lying in a pool of blood.  Sousa died later at a hospital.

After the robbery, Boatman and Jones returned to the car, and the threesome fled the scene with Boatman driving.  Boatman dropped off Jones and Montgomery, returned to his home and deflated his car tires to make it appear that his car was disabled.  He then walked back to rejoin Montgomery and Jones.  He learned then that there were no drugs available to buy with the robbery proceeds.

The three men were identified as the robbers/killers in an anonymous tip to police.  The police found the murder weapon during a search of Boatman's house.  They arrested Boatman.

Boatman entered a plea of guilty to second degree murder on December 17, 1986.  His guilty plea had two conditions:  he would be committed to the California Department of Corrections but would be housed in a California Youth Authority ("CYA") facility until he was

25 years old, if agreed to by the CYA, and he would not be sentenced until after the trial of his co-defendant, Jones.  The CYA refused to accept Boatman into its custody.  The plea bargain had no agreement that the district attorney's office would support parole and had no agreement about whether or when Boatman would be released from prison.

B.      Parole Proceedings

Boatman's fifth subsequent parole suitability hearing occurred in April 6, 2005.  Resp. Exh. 2.   He and his attorney were given an opportunity to be heard and both spoke at the hearing.  The BPH panel discussed and considered Boatman's individual circumstances tending to show parole suitability and unsuitability.  The panel considered Boatman's records, prior hearing transcripts, and the probation officer's report in making its decision.  The BPH found Boatman suitable for parole.  After announcing the decision, the BPH noted that the Governor had the power to review it.

On August 24, 2005, Governor Schwarzenegger reviewed the parole decision and reversed the BPH's April 6, 2005 decision finding Boatman suitable for parole.  Governor Schwarzenegger relied on the nature of the commitment offense to find him unsuitable, notwithstanding the many positive factors in the record.  Resp. Exh. 4.

After the Governor's decision, Boatman sought a writ of habeas corpus in the state courts. The Fresno County Superior Court denied the petition for writ of habeas corpus on the merits. Resp. Exh. 9.  The California Court of Appeal and the California Supreme Court denied Boatman's petitions for writ of habeas corpus without comment.  See Resp. Exhs. 11, 13.

Boatman has a rather interesting parole consideration history.  He apparently was found not suitable for parole at the first two hearings held for him.  At his third subsequent parole suitability hearing in July 2002, he was found suitable by the BPH.  Then-Governor Gray Davis reversed that decision and found him not suitable for parole in December 2002.  (That December 2002 decision was the subject of the habeas petition in Boatman v. Brown, C 04-2595 SI, denied by this court in May 2005, and currently pending on appeal in the Ninth Circuit Case No. 05-

16199.[1])  At his fourth subsequent parole suitability hearing in July 2003, Boatman was found not suitable by the BPH.  At his fifth subsequent parole suitability hearing in April 2005, he was found suitable by the BPH.  In August 2005, Governor Schwarzenegger reversed that decision and found him not suitable.  (That August 2005 decision is the subject of the present petition.)  At his sixth subsequent parole suitability hearing in June 2006, Boatman was found not suitable by the BPH.  (That June 2006 decision is the subject of the habeas petition pending in Boatman v. Ayers, C 07-3412 SI, for which the petitioner has not yet filed his traverse.)

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at San Quentin State Prison in Marin County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in

---

[1]The Ninth Circuit case was argued and submitted on January 14, 2008, but the docket sheet states that an order was entered on January 24, 2008 deferring submission of the case to await the Ninth Circuit's decision on a petition for panel rehearing and rehearing en banc in Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir. 2008).

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.      Due Process Requires That Some Evidence Support a Parole Denial

        A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir. 2008); Sass, 461 F.3d at 1127-28; Cal. Penal Code § 3041(b); see also Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979).

        A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole authority. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56.)  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or

otherwise arbitrary.'" <u>Id.</u> at 1129 (quoting <u>Superintendent v. Hill</u>, 472 U.S. at 457).[2]  The some evidence standard of <u>Superintendent v. Hill</u> is clearly established law in the parole context for purposes of § 2254(d).  <u>Sass</u>, 461 F.3d at 1129.  As a matter of state law, the governor's decision must also satisfy the "some evidence" standard.  <u>See</u> <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 676-77 (Cal. 2002), <u>cert. denied</u>, 538 U.S. 980 (2003).  Because the governor's review is an extension of the parole consideration process and the parole decision does not become final until such review has occurred (or the time for it has passed), the governor's decision must be supported by some evidence.

What little guidance has come from the Supreme Court suggests that judicial review should be extremely deferential to the original decision-maker in the parole context.  In addition to the very low evidentiary standard that <u>Superintendent v. Hill</u> imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision.  <u>See</u> <u>Greenholtz</u>, 442 U.S. at 13.  "No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of decisionmakers in predicting future behavior.  Our system of federalism encourages this state experimentation." <u>Id.</u>; <u>see also</u> <u>id.</u> at 8.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies.  <u>See</u> <u>Hayward</u>, 512 F.3d at 542.  One must look to state law to answer the question, "'some evidence' of what?"

---

[2]Although <u>Sass</u> saw the requirement that the decision not be "otherwise arbitrary" as part of the "some evidence" standard, 461 F.3d at 1129, <u>Hayward</u> saw the "some evidence" requirement as separate from the requirement that the decision not be "otherwise arbitrary." <u>Hayward</u> quoted <u>Irons</u>, <u>infra</u>, for the proposition:  "We have held that 'the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary."'" <u>Hayward</u>, 512 F.3d at 542.

B.      State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 546 U.S. 844 (2005); Cal. Penal Code § 190. The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b). California law adds a layer of review by giving the governor the power to review the BPH decision and to affirm, modify or reverse the decision but only on the basis of the same factors the parole authority is required to consider. See Cal. Penal Code § 3041.2; Cal. Const. art. V, § 8(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses

1    of similar gravity and magnitude with respect to the threat to the public."[3]   The regulation also

2    provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on

3    parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and

4    denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of

5    danger to society if released from prison."  15 Cal. Code Regs. § 2402(a).  The panel may

6    consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2402(b).

7         The governor of California is authorized to review the BPH's decision.  The governor

8    does not have unfettered discretion, but rather must make his parole decisions based on the same

9    factors discussed above that the BPH is required to consider.  See Rosenkrantz, 29 Cal. 4th at

10   625-26.  "The Governor may only affirm, modify, or reverse the decision of the parole authority

11   on the basis of the same factors which the parole authority is required to consider."  Cal. Const.

12   art V, § 8(b).  The constitutional provision also provides that no decision of the BPH on a lifer's

13   parole eligibility becomes effective for a period of 30 days, during which the governor may

14   conduct his review.  Nothing in the regulations, statutes or state constitution appears to require

15   any deference by the governor to the BPH's decision.  That is, he must consider the same factors

16   and same evidence as the BPH but need not defer to any of its findings.

17        The federal habeas court's task is not to determine whether some evidence supports the

18   reasons cited for the denial of parole, "but whether some evidence indicates a parolee's release

19   unreasonably endangers public safety.  Some evidence of the existence of a particular factor does

20   not necessarily equate to some evidence the parolee's release unreasonably endangers the public

21   safety."  Hayward, 512 F.3d at 543 (citation omitted).

22

23   _____

24        [3] The listed circumstances tending to show unsuitability for parole are the nature of the
     commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous,
     atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an
25   unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner
     has a lengthy history of severe mental problems related to the offense; and negative institutional
26   behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show suitability
     for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful
27   motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack
     of criminal history, the present age reduces the probability of recidivism, the prisoner has made
28   realistic plans for release or developed marketable skills, and positive institutional behavior.  15
     Cal. Code Regs. § 2402(d).

A critical issue in parole denial cases concerns the parole authority's use of evidence about the murder that led to the conviction.  Four Ninth Circuit cases provide guidance for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, Irons v. Carey, 505 F.3d 846 (2007), and, most recently, Hayward, 512 F.3d 536.  Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass, which criticized the Biggs statements as improper speculation and beyond the scope of the dispute before the court.  Sass, 461 F.3d at 1129.  Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability.  See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).  The next decision, Irons, aligned with Biggs, determining that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence, but emphasized that in all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853.   Most recently, Hayward granted relief to a prisoner who had been in custody 27 years on his 15-to-life sentence.  Hayward repeated the quoted passage from Biggs

and stated <u>Irons</u> had noted that "'in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.' <u>Irons</u>, 505 F.3d at 854. 'The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.' [<u>In re</u>] <u>Scott</u>, 133 Cal.App.4th [573, 595 (Cal. Ct. App. 2005)]." <u>Hayward</u>, 512 F.3d at 545.[4]

The message of these cases is that the parole authority can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u>, <u>Irons</u>, and <u>Hayward</u>). Also, the focus must be on whether the commitment offense demonstrates present dangerousness if it is relied upon to deny parole (<u>Hayward</u>).  <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

C.    <u>The Governor's Decision Did Not Violate Boatman's Due Process Rights</u>

This case squarely presents the issue of reliance on only the commitment offense to deny parole.  The Governor stated:

> Although he claims to have remorse and accept responsibility for Mr. Sousa's murder, Mr. Boatman has maintained throughout his incarceration, and as recently as during his

---

[4]The California Supreme Court has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." <u>Dannenberg</u>, 34 Cal. 4th at 1071; <u>see also In re Rosenkrantz</u>, 29 Cal. 4th 616, 682-83 (Cal. 2002), <u>cert. denied</u>, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").  <u>Hayward</u> does not explain how <u>Dannenberg</u>'s more-than-the-minimum-elements rule fits into the picture.

10

2005 parole hearing, that he did not know anyone would get hurt during the robbery despite his crime partner's remarks beforehand that there would be no concern about being identified by witnesses. This to me is some evidence that Mr. Boatman may not fully grasp the consequences of his actions or the magnitude of his role in this murder. Regardless of Mr. Boatman's claimed belief as to what would happen, it was he who brought along the gun–and he was an active, willing, and major participant in a planned armed robbery that resulted in the shooting death of Mr. Sousa. Mr. Boatman's actions therefore exceeded the minimum necessary to sustain a conviction for second-degree murder, and make the murder for which he was convicted especially heinous. This factor alone is enough for me to conclude at this time that Mr. Boatman's release from prison would pose an unreasonable public-safety risk. Moreover, the manner in which Mr. Sousa was murdered was particularly cruel and senseless. Mr. Sousa fully cooperated with his assailants and then was shot in the neck after he turned away.

      *  *  *

Mr. Boatman is now 40 years old and has made some creditable gains in prison over the years. But based on the current record before me and after carefully considering the very same factors the Board is required to consider, I find the gravity of the murder committed by Mr. Boatman presently outweighs any positive factors tending to support his parole suitability. Accordingly, because I believe his release from prison would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2005 decision to grant parole to Mr. Boatman.

Resp. Exh. 4.

  The Fresno County Superior Court denied Boatman's petition challenging the Governor's decision. See Resp. Exh. 9. That court correctly identified the "some evidence" standard as the applicable standard for judicial review, as evidenced by its citation to In re Rosenkrantz, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v. Hill some evidence standard as the proper standard for judicial review of evidentiary sufficiency for parole denial cases. See Rosenkrantz, 29 Cal. 4th at 665-67. The court then explained that the Governor had identified four factors that supported his decision: (1) Boatman continued to claim he didn't know anyone would get hurt during the robbery despite his crime partner's remarks beforehand that there would be no concern about being identified by witnesses; (2) Boatman was an active, willing and major participant in a planned armed robbery that resulted in the shooting death; (3) Boatman's actions exceeded the minimum necessary to sustain a second degree murder conviction and make it an especially heinous murder, and (4) the manner of the murder was especially cruel and senseless in that the victim cooperated fully and was shot in the neck as he turned away. Id. at 2. The court noted that it could not re-weigh the evidence relied upon by the Governor to make his decision and then concluded that the Governor's decision satisfied the

11

1  some evidence standard.

2      Boatman does not identify any factual error in the Governor's or the state court's recitation
3  of the crime; instead, he disagrees with their reasoning and conclusion.  He suggests that the
4  Governor should not have relied on the robbery to find that the crime exceeded the minimum
5  elements necessary for a conviction because the robbery charge was dismissed as part of the plea
6  bargain.  Petition, p. 4.  Although the robbery charge was dismissed, the Governor was not
7  precluded from considering all the relevant facts, one of which was that the killing was done
8  during a robbery.  The facts would support a first degree murder conviction, even though
9  Boatman had pled guilty to second degree murder.  <u>See</u> Cal. Penal Code § 189 (murder
10 committed during robbery and other specified felonies is first degree murder).  The <u>only</u>
11 favorable fact for Boatman was that he was not the actual shooter (who received life without the
12 possibility of parole).  Even though Boatman was not the shooter, he had extensive involvement
13 in the crime as he had supplied the car and the murder weapon and had participated in the
14 significant planning for the robbery.

15     Boatman also seems to urge that the Governor was bound by the trial court's
16 determination that he was not a party to the murder but only to the robbery.  Petition, p. 9.
17 Boatman takes the statements at his change-of-plea hearing out of context.  The district
18 attorney's statements[5] reflected a concern that the co-perpetrators might try to manipulate the
19 system by telling conflicting stories as to who the actual shooter was – as might happen if
20 Boatman got a second degree murder conviction based on his representation that he was not the
21 shooter and then told a different story at the co-defendant's trial and say he (Boatman) was in
22 fact the shooter so that the co-defendant could be exonerated.  In no reasonable way can the

23

24 _____

25     [5]The district attorney stated that the plea agreement is "conditioned on the fact that the
   defendant was not a party to the killing of John Souza, the named victim in this Complaint, but
   he was only a party to the robbery of the 41 Market and John Souza.   [¶] The second two
26 conditions that I want to state, are not stated for the purpose of obtaining the defendant's
   testimony, <u>but they are in order to protect the People from any scheme to provide false testimony</u>
27 in violation on the first condition."  Petition, Exh. B, RT 1 (emphasis added).  Those conditions
   were that Boatman would not be sentenced until after the conclusion of the trial for Harold Jones
28 (the shooter), and that Boatman would give a statement as to his personal participation in the
   crime.  <u>Id.</u> at 1-2.

prosecutor's statements be viewed as absolving Boatman of responsibility for the murder.

Boatman disagrees with the Governor's assessment that he was not remorseful.  He notes that he had expressed remorse and a BPH panel member even said he was remorseful.  Petition, pp. 4-5.  The Governor considered the remorse issue to be connected to acceptance of responsibility, which was a reasonable connection.  The Governor simply did not believe Boatman's assertion that he did not know anyone would get hurt during the robbery, and this led him to believe Boatman may not fully grasp the consequences of his action or the magnitude of his role in this murder.  The hearing transcript discloses that even the BPH panel members were at least skeptical about Boatman's assertion that he didn't think anyone was going to get hurt, especially when the shooter said they didn't need to worry about witnesses.  See RT 9-11, 48 (Boatman's statement that he didn't think anyone was going to get hurt was statement may have been "naievete to the highest degree").  The Governor's determination that Boatman's explanation indicated that he may not have grasped fully the consequences or the magnitude of his role in the murder was a reasonable conclusion.

The Governor considered a circumstance proper under California law, as one of the circumstances tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner."  15 Cal. Code Regs. § 2402(c)(1).  Boatman's activities on the day of the killing would have supported a first degree felony murder conviction and were beyond the minimum elements necessary to constitute a second degree murder and therefore supported the Governor's decision that the commitment offense was especially heinous.  See Dannenberg, 34 Cal. 4th at 1071.

The record discloses, and the Governor's decision recognizes, that Boatman has been an excellent prisoner for the 19 years he has been in the California prison system.  Boatman has not had any disciplinary write-ups; he has improved his educational level; he has developed marketable job skills; he has participated in numerous self-help and therapy programs; he has maintained positive relationships with family and friends; and he has realistic parole plans.  Boatman also has received favorable psychological evaluations.  Notwithstanding all the positive factors supportive of his release, the Governor believed the criminal offense committed in 1985

that landed Boatman in prison was so bad that it – along with Boatman's failure to grasp fully his role in the murder – still had enough weight to show that Boatman posed an unreasonable risk of danger to society if released from prison in 2005.  The Governor did not act arbitrarily or capriciously or without some evidentiary support in determining that the circumstances of the crime committed showed that Boatman currently presented an unreasonable risk of danger to society if released, some 19 years into his 16-to-life sentence.  Bearing in mind that this court's chore is to consider not whether some evidence supports the reasons, but whether some evidence indicates Boatman's release unreasonably endangers public safety, see Hayward, 512 F.3d at 545, this court concludes that the Governor's decision satisfies that requirement.  Boatman's parole history shows that reasonable minds can and have differed in their assessment of his current dangerousness based primarily on the commitment offense.  Indeed, even as he announced that the panel was granting parole in 2005, the commissioner noted the "distinct possibility" that the Governor would reverse because of the seriousness of the crime.  RT 49, 52.

The Fresno County Superior Court upheld the decision in a reasoned decision.  Because the Fresno County Superior Court's decision is the last reasoned decision, that is the decision to which § 2254(d) applies.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 547 U.S. 1138 (2006).  That court's rejection of Boatman's due process claim was not contrary to or an unreasonable application of Superintendent v. Hill's some evidence standard.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 17, 2008

_____
SUSAN ILLSTON
United States District Judge